972 F.2d 349
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph PARILLO, Defendant-Appellant.
 No. 91-3592.
 United States Court of Appeals, Sixth Circuit.
 July 28, 1992.
 
 Before DAVID A. NELSON, BOGGS and KRUPANSKY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Joseph Parillo (defendant) appealed the judgment of the district court in which he was found guilty by the jury as the principal in fourteen counts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, and six counts as the principal in transporting funds fraudulently obtained in interstate commerce in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2. The court sentenced the defendant to thirty-six months imprisonment on each count to be served concurrently, two years of supervised release on counts 18-20 to be served concurrently, and a special assessment fee of one thousand dollars. The defendant timely appealed both the judgment and sentence.
 
 
 2
 On September 11, 1990, the grand jury in the Southern District of Ohio returned an indictment charging the defendant with fourteen counts of mail fraud and six counts of interstate transportation of funds fraudulently obtained. Counts 1 through 14 alleged that from August 9, 1987 to October 28, 1987, fourteen individuals returned postcards in response to a mail solicitation initiated by Parillo to induce the purchase of insurance policies. Counts 15 through 20 alleged that on or about September 29, 1987 to November 1, 1987, Parillo unlawfully transported in interstate commerce from Columbus, Ohio to Texas, six fraudulently obtained checks each exceeding $5,000.
 
 
 3
 The facts which initiated the indictment disclosed that in the fall of 1986, Parillo met with the Chief Executive Officer ("CEO") of the Western Insurance Companies, Western Fidelity Company, and the Richard Dale Agency (collectively "Western") to discuss a proposal whereby Western would issue a whole life insurance policy with an annuity rider, called the "Annuity Accumulator."[1] Western reacted favorably to the defendant's proposal and entered into a contract with Parillo who was appointed as the general agent responsible for every aspect of marketing the Annuity Accumulator in Ohio.
 
 
 4
 Briefly, the Annuity Accumulator policy could be purchased for $6,250 per unit; $1,250 of which purchase price was earmarked as the initial payment for life insurance. The remaining $5,000 funded an annuity on behalf of the insured. The annual premium for the policy was two hundred dollars. The annuity payable to the insured was interest bearing. Interest from the annuity, which accrued at an anticipated annual rate of 10%, was in addition to dividends if any were declared and could be applied against the annual life insurance premium.
 
 
 5
 Pursuant to Ohio law,[2] Western filed the initial 1986 version of the policy with the Ohio Department of Insurance for qualification in March of 1987. Thereafter, Western filed a sequence of three proposed modifications of the policy with the Department of Insurance for qualification under Ohio law in September and October of 1987 and May 19, 1988. The president of Western testified that in September of 1987, Western adopted and applied the national 1980 mortality tables to its policies and reduced the penalty for early withdrawal of all or part of the monies in the annuity rider from a constant eighteen percent to sixteen percent in the first three years, decreasing two percent per year thereafter. He further stated that the October of 1987 modifications were not substantive changes.[3] In the May of 1988 modification, language was included to clarify the dividend provision and stated that such dividends, if and when declared, would be permitted to accumulate and credited to the annuity fund unless the insured elected to draw down the dividends directly. A copy of the policy that had been filed with the Department of Insurance on May 19, 1988, was admitted into evidence. When the government proffered its proof, the parties acknowledged that they had been unable to conform the policies which had been sold to Parillo's customers with any of the various pro forma policies that had been filed with the Ohio Department of Insurance. The defendant objected to the admission of the filed May 19, 1988 pro forma policy initially charging that it was not the pro forma policy which had been filed with the Ohio Department of Insurance in March of 1987, was not representative of the policies which had been sold to Parillo customers, and consequently, did not constitute the "best evidence." The district court overruled the objection.
 
 
 6
 Parillo's merchandising of the Annuity Accumulator in Ohio was initiated by the purchase of postcard "leads" from a Texas mailing firm. The Texas firm targeted Ohio residents over 55 years of age who had an annual income that exceeded $30,000. The mailings included detachable postcards which solicited the Ohio targets to return completed cards to the Texas company indicating an interest in the policy. Parillo then purchased the returned postcard leads at $8.50 per affirmative response and employed telemarketers to contact the Ohio respondents and arrange appointments with Ohio sales agents to discuss the policy further.
 
 
 7
 The defendant employed and commenced training Ohio sales agents in June of 1987. Parillo's training sessions misrepresented the entire Annuity Accumulator policy concept to his sales staff. Briefly, Parillo advised the sales personnel that payments received from customers would be invested in first mortgages on real estate which would result in profits that would permit participants to double their investment in five and one-half years while their annuity in the policy earned an additional ten percent interest. He instructed his trainees that the Annuity Accumulator qualified as an IRA rollover; that invested funds would remain liquid against which a participant could borrow up to 80% of equity; and that the life insurance coverage of the Annuity Accumulator required no annual premium payments. Parillo's agents testified that during an October 8, 1987 training session they were required to sign a Western memorandum indicating that they had read the insurance policy which they were to sell to Ohio customers; however, they had not been given time to review the policy. Both the memorandum and copy of the policy attached thereto were admitted into evidence without objection.
 
 
 8
 Parillo's misrepresentations were incorporated into customer sales presentations. The court admitted a copy of Parillo's sales brochure into evidence without objection. Interested Ohio participants were instructed to mail their enrollment checks, made payable to Western, to Parillo's Texas headquarters. All of the checks exceeded $5,000. Thereafter, the checks were transmitted to and negotiated by Western. The Parillo sales agent delivered the policy to the owner. A customer had ten days within which to examine a purchased policy and seek cancellation and a refund. All customer inquiries were directed to and answered exclusively by Parillo. The court admitted six checks into evidence without objection.
 
 
 9
 Parillo's Ohio agents realized that he had misrepresented the policy to them when they obtained a copy of the policy and prospectus which had been filed with the Ohio Department of Insurance.[4] The prospectus and policy which had been supplied by Parillo and used by them to solicit customers differed materially from those filed with the Ohio Department of Insurance. One agent, Bill Mackin (Mackin), subsequent to discussing the substantive discrepancies between the policies with executives of other insurance companies, filed a complaint against Parillo with the Department of Insurance.
 
 
 10
 Upon becoming aware of the developing legal conflicts and Parillo's misrepresentations, his entire Ohio staff resigned. Thereafter, Parillo resigned as an agent for Western. Subsequently, the Ohio Department of Insurance entered into a consent agreement with Western that protected and reimbursed all parties that had purchased Annuity Accumulator policies. No Ohio participant suffered a monetary loss.
 
 
 11
 After the jury returned its verdict of guilty, the court denied the defendant's motion for acquittal notwithstanding the verdict.
 
 
 12
 The court sentenced Parillo to thirty-six months imprisonment and two years of concurrent terms of supervised release on counts 18-20, and a special assessment of one thousand dollars. The court overruled defendant's objections to the presentence report. It concluded that pursuant to U.S.S.G. § 2B1.1, the loss charged in the indictment included the possibility of losses that could have accrued had the fraud been carried to its likely fruition. Consequently, the court calculated that Parillo sold 321 units of the Annuity Accumulator to approximately 200 Ohio residents for approximately $2,006,250, plus Texas sales which amounted to $1,793,200. After the trial court combined the total of the fraudulently obtained funds, i.e., $3,799,450, it enhanced the defendant's base offense level of six by ten points pursuant to U.S.S.G. § 2F1.1 based upon the combined Ohio and Texas monetary figures. The court also enhanced the sentence by two additional points as a victim related adjustment pursuant to U.S.S.G. § 3A1.1 because the targeted "elderly" population was considered to be vulnerable.
 
 
 13
 Parillo timely filed his notice of appeal on June 14, 1991.
 
 
 14
 In his first assignment of error, the defendant charged that the district court abused its discretion when it admitted the May 19, 1988 policy as the pro forma of the policy which had been filed initially by Western with the Ohio Department of Insurance in March of 1987 because it did not conform to the Best Evidence Rule, Fed.R.Evid. 1002, without a preliminary showing that the original contract was not obtainable, lost or destroyed. It is the rule in this Circuit that a duplicate of a document is admissible into evidence to the same extent as the original unless there is a genuine conflict as to the copy's authenticity or unless its admission would be unfair. United States v. Murray, 785 F.2d 311 (6th Cir.1986). Parillo's misrepresentation in the instant action targeted his subagents and the individuals to whom they sold the Annuity Accumulator policy. Accordingly, the policy which would represent the best evidence was the one which had been presented to the policyholders as a prospectus to induce the sale. The six checks offered into evidence to support counts 15 through 20 of the indictment were dated either in September or October of 1987. The authenticity and comparative substantive content of the pro forma policy filed with the Ohio Department of Insurance on May 19, 1988 which was admitted into evidence and the policies sold to customers were verified by the president of Western, Parillo's agents, as well as the individuals that purchased the policy. Further, a copy of the policy sold to Ohio consumers was part of an exhibit which was attached to a memorandum signed during October of 1987 by the defendant's Ohio agents. Since the defendant questioned the disappearance of the original policy and failed to assert a genuine conflict as to the May 19, 1988 policy's authenticity, the court did not abuse its discretion when it admitted the May 19, 1988 policy into evidence. Accordingly, this assignment of error is without merit.
 
 
 15
 The defendant's second assignment of error is equally without merit. He asserted that Mackin's hearsay testimony concerning two unidentified insurance company executives who evaluated the legality of the pro forma prospectus here in controversy was inadmissible. Mackin's testimony, however, was offered to explain his course of action after he discovered that the sales prospectus issued by Parillo was in conflict with the one on file with the Ohio Department of Insurance. Since the purpose of the hearsay was admitted to explain Mackin's course of conduct and not to prove the illegality of Parillo's conduct, the trial court's ruling was not clearly erroneous.
 
 
 16
 The defendant's third assignment of error is worthy of consideration and further analysis. In arriving at defendant's base offense level for sentencing purposes the district court, pursuant to U.S.S.G. § 2B1.1, enhanced his base offense level of six by ten points presumably because it projected the aggregate probable loss of the perpetrated fraud, i.e., the loss that could have accrued had it been carried to its likely fruition, to be between two and five million dollars. Mindful of the records disclosure that Western had held all Annuity Accumulator policy holders harmless from any financial or other loss, the district court's disposition appears to be erroneous when considered within the parameters of Application Note 7 in the Commentary to U.S.S.G. § 2F1.1, which would indicate that the loss in issue was not the full amount invested by the policy holders, i.e., the purchase price of the Annuity Accumulator units, but rather the difference between what the defendant had promised and what he had ultimately delivered.
 
 
 17
 In recalculating the defendant's base offense level pursuant to Application Note 7 in the Commentary to U.S.S.G. § 2F1.1, the trial court's attention is directed to the analogue that confronted the Seventh Circuit in U.S. v. Schneider, 930 F.2d 555 (7th Cir.1991). In its disposition of Schneider, the court distinguished between a fraud wherein the perpetrator intended to pocket the entire inducement and had no intention of performing the promised undertaking and a fraud that had been committed to obtain a contract that the perpetrator might otherwise not obtain, but intended and was able to perform and intended to pocket, as in the instant case, only the difference between the advanced payment and his costs of doing business--in this case the defendant's commissions which accrued from the sale of the Annuity Accumulator policies.
 
 
 18
 Accordingly, the district court's calculation of the enhancement of the defendant's base offense level of six by ten points is reversed and remanded for recalculation and resentencing.
 
 
 19
 The defendant, has also correctly argued that the government has failed to prove that the victims of this fraudulent scheme were particularly vulnerable because of age to warrant a two-level enhancement under U.S.S.G. § 3A1.1. Although the defendant targeted Ohioans over 55 years of age who made over $30,000 a year, the factors of age and income alone do not make members of the group unusually vulnerable under a correct interpretation of § 3A1.1. United States v. Moree, 897 F.2d 1329, 1335-36 (5th Cir.1990). Accordingly, this court reverses the district court's imposition of a two-level enhancement based upon victim vulnerability.
 
 
 20
 Upon a review of the record in its entirety, the briefs and arguments of counsel the defendant's conviction is hereby AFFIRMED. The district court's calculation of the enhancement of the defendant's base offense level of six by ten points and its calculation of the two-level enhancement of defendant's base offense level for victim vulnerability are REVERSED and REMANDED for resentencing in accordance with this opinion.
 
 
 
 [1]
 A whole life insurance policy is funded by a customer's life time premium payments. The policy matures at age 100 and accumulates cash equity value which is available to the insured after a specified time
 
 
 [2]
 Ohio Rev.Code Ann. § 3902.03 (Anderson 1989) mandates that an insurer must file the proposed pro forma insurance policy, related forms and a prospectus with the Ohio Department of Insurance for approval
 
 
 [3]
 For example, the annuity rider was originally denominated as an annuity deposit. The October 1987 filing changed the designation to "annuity rider."
 
 
 [4]
 This brochure was filed with the Ohio Department of Insurance on October 7, 1987