In re NATIONAL CENTURY FINANCIAL ENTERPRISES, INC., et al., Debtors.

The Unencumbered Assets Trust, as successor in interest to National Century Financial Enterprises, Inc., et al., Plaintiff,

v.

Biomar Technologies, Inc., et al., Defendants.

Bankruptcy No. 02–65235.
Adversary No. 04–2015.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

April 18, 2006.

David A. Beck, Paul R. Brown, Sean P. Byrne, Drew H. Campbell, Kasey T. Ingram, Matthew A. Kairis, Charles M. Oellermann, Joseph M. Witalec, Joshua A.T. Fairfield, Columbus, OH, Robert R. Hall, Phoenix, AZ, Paul E. Harner, Chicago, IL, Robert J. Madden, Kathy D. Patrick, Brandon T. Allen, Sydney Ballesteros, Harold B. Murphy, Boston, MA, Ernest B. Williams, Nashville, TN, for Debtors.

*MEMORANDUM OPINION FOLLOW-ING TRIAL ON PLAINTIFF'S COMPLAINT AND OBJECTION TO CLAIM*

DONALD E. CALHOUN, JR.
Bankruptcy Judge.

In this adversary proceeding, the Unencumbered Assets Trust (successor in interest to the Debtors—National Century Financial Enterprises, Inc. and its related entities) brought suit against Biomar Technologies, Inc. to avoid and recover alleged fraudulent transfers.[1] Following a trial on Plaintiff's fraudulent transfer claim, the Court finds that Biomar received a total of $608,000.00 from NCFE as payment for software licenses and services that Biomar provided to various third-party healthcare facilities. Because NCFE itself did not receive a concrete benefit as a result of these payments in a quantity reasonably equivalent to $608,000.00, the Court finds that Plaintiff can avoid these payments under section 548(a)(1)(B) of the Bankruptcy Code and is entitled to judgment against Biomar in the amount of $608,000.00 under section 550(a)(1) of the Bankruptcy Code.

Also within this suit, Plaintiff objected to Biomar's proof of claim on two grounds, both of which have merit. First, Plaintiff proved that NCFE never agreed to pay Biomar for the software services Biomar allegedly rendered at one third-party hospital, VillaView University Hospital ("Villa View"), and never agreed to pay Biomar the so-called "monthly maintenance" fees for a set of third-party clinics, Clinica Medica Familiar ("Clinics"). Biomar's claim consists of the monies due for services and maintenance allegedly performed at VillaView and the Clinics. Because NCFE never agreed to pay Biomar for the amounts that make up Biomar's claim, the claim should be disallowed under section 502(b)(1) of the Bankruptcy Code. Second, the claim should also be disallowed because NCFE did not receive reasonable

---

1. The Court will refer to the Unencumbered Assets Trust as "Plaintiff" and Biomar Technologies, Inc. as "Defendant" or "Biomar." The Court will also use the terms "NCFE" to refer to National Century Financial Enterpris-es, Inc. and "Debtors" to refer to the Debtors, which includes NCFE and its related entities and subsidiaries that sought Chapter 11 bankruptcy relief.

equivalent value even close to the amount of the alleged obligation under section 548(a)(1)(B) of the Bankruptcy Code. Therefore, the Court sustains Plaintiff's objection to Biomar's claim.

### I. Jurisdiction—Adversary Proceeding

The Court has jurisdiction over this adversary proceeding and objection to claim pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference entered in this district. The adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and the objection to claim is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### II. Factual and Procedural Background

#### A. Debtors' and Biomar's Backgrounds

The Debtors were one of the country's largest providers of healthcare accounts receivable financing. The Debtors financed and serviced more than $15 billion in healthcare accounts receivable. The Debtors also provided other financing and leasing services to healthcare companies.

The Debtors historically financed the purchase of eligible receivables primarily through private placement sales of bonds to institutional investors. The Debtors offered financing to healthcare providers by purchasing from them certain of their receivables—monies due to the providers from insurance companies and insurance-like programs—for services performed by the providers. All of the Debtors' outstanding bonds as of the NCFE petition date were issued by Debtors NPF VI and NPF XII.

NPF VI and NPF XII were special purpose entities that obtained money from investors in exchange for promissory notes. As of the Debtors' Chapter 11 filings on November 18, 2002 ("Petition Date"), it is reported that the aggregate outstanding principal amount of the bonds issued by NPF VI was $924,995,000.00, and the aggregate outstanding principal amount of the bonds issued by NPF XII was $2,047,500,000.00.[2]

Biomar, founded in 1992, offers several computer software products utilized in the healthcare industry. Biomar's hospital information system tracks patient charges generated from the point of admission through a patient's stay in the hospital. The system captures all charges including such services as laboratory tests and radiology work. Once the data is collected, the system "drops" the billing information into a billing module, which formats the data for the ultimate billing to the payor. The system further provides for compilation of the hospital's receivables. *See* Vol. I at 173; *see also* n. 3, *infra.*

#### B. Proof of Claim and Pleadings

Biomar filed a proof of claim on April 22, 2003 in NCFE's Chapter 11 case asserting that NCFE owed Biomar $790,000.00 for pre-petition "services performed" at Santa Marta Hospital ("Santa Marta"), Villa-View, the Clinics and Lincoln Hospital Medical Center ("Lincoln Hospital"). *See* Proof of Claim No. 711, Case No. 02–65235.

In investigating this proof of claim, NCFE's post-petition management allegedly determined that NCFE had made $608,000.00 in payments to Biomar in the approximately one year prior to the Petition Date. *See* Plaintiff's Ex. 1; Vol. I at 52–63. Because the books and records of NCFE included no contract, lease, or loan documentation supporting either these

---

**2.** *See Amedisys v. JP Morgan Chase Manhattan Bank (In re Nat'l Century Fin'l Enters., Inc.),* 310 B.R. 580 (Bankr.S.D.Ohio 2004).

payments or Biomar's claim, NCFE objected to Biomar's $790,000.00 proof of claim and sued Biomar to avoid and recover the $608,000.00 as fraudulent transfers. *See* Vol. I at 87; Vol. III at 40, 123.

In its complaint and objection to claim filed on January 13, 2004, NCFE asserted claims for avoidance of fraudulent transfers under sections 544(b) and 548(a) and recovery of those transfers under section 550(a) of the Bankruptcy Code. NCFE also asserted the theory of unjust enrichment and objected to Biomar's claim under sections 502(b)(1) and 548(a) of the Bankruptcy Code. *See* Doc. 1. Biomar's claim allegedly consisted of unpaid invoices relating to the licensing of computer software and provision of software and data conversion services to various healthcare providers. *See id.,* ¶¶ 12–13. Similarly, NCFE alleged that the $608,000.00 payments made by NCFE to Biomar are avoidable fraudulent transfers that benefitted unrelated third-party healthcare providers not affiliated with NCFE. In its answer, Biomar asked that the Court enter judgment in its favor and allow its claim in full. *See* Doc. 5.

On October 4, 2004, Biomar moved to amend its proof of claim, *see* Doc. 27, in an attempt to fit its claim into the C–7 Convenience Class under the Debtors' Joint Plan of Liquidation. *See* Vol. II at 133–34. In its proposed amended claim, Biomar withdrew its claim for payment for services rendered to Santa Marta and its claim for a $150,000.00 "termination fee" relating to Lincoln Hospital. The amended proof of claim seeks payment of $495,000.00 only, relating to services Biomar says it provided at the Clinics and VillaView.

## C. Trial

The Court conducted a trial on July 26 and 27, 2005, and heard remaining testimony on August 10, 2005.[3] Witnesses for the Plaintiff included Charles Jennings, Jeffrey Benton, and Joyce Chester. Witnesses for Biomar included Allan Martia and Randolph Speer.

Mr. Jennings consults for the Plaintiff and formerly headed client services for NCFE, which would handle bankruptcy and litigation matters involving NCFE's client healthcare providers. *See* Vol. I at 36–38. Mr. Benton, a CPA, manages FTI Consulting and currently acts as financial advisor to Irwin Katz, the Trustee for the Plaintiff. *See id.* at 129–30. Ms. Chester was an account manager for NCFE for approximately 10 years until November 2004. *See* Vol. III at 200. Mr. Martia formed Biomar in 1992 with two other people and has been the President and CEO since its inception. *See* Vol. I at 171. Mr. Speer was the chief financial officer of NCFE from September 1999 to November 2002. *See* Vol. III at 10.

The parties submitted the following post-trial briefs to the Court: Defendant Biomar's Post Trial Brief: Proposed Findings of Fact and Conclusions of Law (Doc. 86); Plaintiff's Post–Trial Brief (Doc. 87); Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. 88); Plaintiff's Objections to Exhibits of Defendant Bio-

---

3. Robert Hamilton, Mary Tait, and David Beck appeared on behalf of Plaintiff and Michael Kolman and Rick Brunner appeared on behalf of Biomar. "Vol. I" refers to the trial transcript for the first day of trial dated July 26, 2005. *See* Doc. 3770, Case. No. 02–65235 (contains incorrect cover sheet dated July 27, 2005 and docket information). "Vol. II" refers to the trial transcript for the second day of trial dated July 27, 2005. *See* Doc. 3771, Case. No. 02–65235 (contains incorrect cover sheet dated July 26, 2005 and docket information). "Vol. III" refers to the trial transcript for August 10, 2005. *See* Doc. 3769, Case. No. 02–65235.

mar Technologies, Inc. (Doc. 89); Plaintiff's Post–Trial Reply Brief (Doc. 90); and Defendant Biomar's Reply Brief to Plaintiff's Post–Trial Brief, Proposed Findings of Fact and Conclusions of Law, and Objections to Exhibits of Defendant Biomar (Doc. 91).

The Court also considered the parties' pre-trial filings. *See* Order (Doc. 69) at 2 ("The briefs submitted in support of and in opposition to the summary judgment requests will be treated by the Court as trial briefs[.]"); *see also* Plaintiff's Motion in Limine to Preclude Hearsay Evidence (Doc. 72) and Defendant Biomar Technologies, Inc.'s Memorandum in Opposition to Plaintiff's Motion in Limine (Doc. 79).

## 1. Lincoln Hospital

At trial, Mr Jennings testified that between October 2001 and October 2002, NCFE paid Biomar $358,000.00 for a software system at Lincoln Hospital. *See* Vol. I at 64; Plaintiff's Ex. 1. This amount included nine monthly payments of a purported maintenance fee. *See* Vol. I at 63–64. According to Mr. Speer, NCFE agreed to make these monthly payments "to ensure that [Allan Martia] had the cash flow to keep his business operating." Vol. III at 127 (quoting from Mr. Speer's deposition). Mr. Martia specifically insisted that NCFE pay Biomar directly because he doubted Lincoln Hospital's financial stability to pay its bills. *See* Vol. II at 77.

Mr. Jennings also testified that Lincoln Hospital was a small inner-city Los Angeles hospital that was indirectly owned by NCFE's founders, Lance Poulsen, Barbara Poulsen, Don Ayers and Rebecca Parrett. *See* Vol. I at 40–41. Lincoln Hospital was entirely dependent on funding from NCFE for its survival. *See id.* at 42, 49. As

early as 1993, Lincoln Hospital had been selling its eligible receivables to NCFE's special purpose entities—NPF VI and NPF XII—under a succession of sale and subservicing agreements. *See id.* at 42–43.

According to Mr. Jennings, Lincoln Hospital did not generate enough eligible receivables to fund its operations and was dependent on unsecured loans from another of NCFE's special purpose entities—NPF X—to stay in business. *See id.* at 49. In 2001, NPF X advanced Lincoln Hospital $15,000,000.00. *See id.* at 50. Between January 1, 2002 and that summer, NPF X also advanced Lincoln Hospital another $12,000,000.00. *See id.* Mr. Jennings and Mr. Benton agreed that Lincoln Hospital was itself hopelessly insolvent during the time period when NCFE was paying Biomar to provide a software system for Lincoln Hospital. *See id.* at 77, 158–59.

When Lincoln Hospital filed for relief under Chapter 11 of the Bankruptcy Code in November 2002[4], it owed the Debtors over $150,000,000.00 according to Mr. Jennings. *See* Vol. I at 47–51. Lincoln Hospital owed NPF XII approximately $45,000,000.00 and owed NPF VI approximately $50,000,000.00. *See id.* at 47. Of this nearly $100,000,000.00 owed from the purchase of pre-petition receivables, Mr. Jennings testified that less than $600,000.00 in receivables was ever collected post-petition. *See id.* at 49. Additionally, as of its petition date, Lincoln Hospital owed NPF X approximately $57,000,000.00 for unsecured advances. *See id.* at 50–51, 108. Mr. Jennings explained that Lincoln Hospital was eventually sold to its post-petition lender, Sun Capital, for only $3,000,000.00—the

---

4. *In re Lincoln Hospital Medical Center, Inc.*, Case No. LA–02–42584, U.S. Bankruptcy Court, C.D. Cal. filed on November 18, 2002.

amount of that lender's advances to the debtor in possession. *See id.* at 78–79.

Mr. Jennings also testified about a comparison he performed between 1) submitted/captured gross accounts receivable; 2) eligible accounts receivable; and 3) collections for time periods before and after the installation of the Biomar system at Lincoln Hospital in March 2002. *See* Vol I at 80–87; Plaintiff's Ex. 7. While gross receivables submitted by Lincoln Hospital to NCFE for funding increased after the installation of the software, Mr. Jennings stressed that eligible receivables—those that NCFE determines to be eligible for purchase through its funding program—experienced no material change after installation, and collections actually decreased. *See id.*

Mr. Jennings also testified that NCFE experienced no decrease in labor costs as a result of the installation of the Biomar system at Lincoln Hospital. *See* Vol. I at 86. Even assuming there was an improvement in backup data for Lincoln Hospital, Mr. Jennings stated it did not result in any economic benefit to NCFE. *See id.*

On the other hand, Mr. Martia, Biomar's CEO, extolled the qualities of Biomar's software system calling it "wildly successful." *See* Vol. I at 222. Mr. Martia also commented on the benefits that NCFE reaped once the system was installed at Lincoln Hospital (and at one of the Clinics where the system went live). He stated that the Biomar system provided detailed information to NCFE concerning accounts receivable on a weekly basis, allowed NCFE to verify that the receivables they were purchasing had value, enabled NCFE to generate the entire medical bill if necessary, and provided NCFE the added benefit of a back-up system and back-up documentation of Lincoln Hospital's receivables. *See id.* at 181–85.

Mr. Speer, NCFE's former CFO, stated that NCFE was satisfied with the Biomar system and that it performed as expected. *See* Vol. III at 78. According to Mr. Speer, the Biomar system enabled NCFE to receive the quick data capture it desired and provided data that could potentially serve as a valuable commodity in the future, meaning the data could have served as a source of revenue in the future. *See id.* at 80–82.

Mr. Speer also emphasized that the Biomar system provided NCFE with a "mirrored system" providing for a duplicate, fully functioning server hardware housed at the Biomar office, which was the same as the hardware located at the healthcare facility. According to Mr. Speer, NCFE had immediate access to complete outstanding medical receivables files, which assured uninterrupted service and access to the receivables for collection purposes. Mr. Speer also stated that the Biomar system facilitated rebilling electronically. He further explained that lockbox collections decreased after installation because the Biomar system helped eliminate the need for reliance on receiving payments at a lockbox. *See* Vol. III at 80–87.

Lastly, Mr. Speer claimed that the Biomar system installed at Lincoln Hospital resulted in increased revenues for Lincoln and a corresponding increase in the receivables that NCFE could ultimately purchase. The increase in receivables available to NCFE would then allow NCFE to also experience a rise in revenue. Counsel for Biomar elicited the following testimony from Mr. Speer on direct examination regarding the impact that the Biomar system had on NCFE's revenues:

Q. Okay. Did you notice any trends as far as the receivables were concerned following the installation of the Biomar system?

A. ....With respect to the information provided by Biomar systems, they were always found to be complete and accurate. I have to condition that in that I didn't do any follow-up work to determine independently that the information was accurate.

What I found was positive trends in the receivables. They were increasing as a result of capturing more revenues, which was part of the system design, to automatically capture charges as those charges were initiated at the correct departmental levels.

And so we did see a rise in their revenues as a result of installation. Beyond that, you know, I didn't do any deep analysis. I didn't perform any diligence or background work with respect to the numbers.

I didn't do any follow-up with collections, other than internally we would have generated collection reports based on monies deposited into NCFE-controlled lock boxes.

I condition that statement because it's always possible that collections don't reach those lock boxes, and so no work was done on my behalf to validate that data or deem it accurate or complete.

Vol. III at 82–83. Counsel for Plaintiff elicited the following testimony from Mr. Speer on cross examination that went to the issue of the effect that the Biomar System may have had on NCFE's bottom line:

Q. And then the next question was: "Did you make any determination as to whether or not the installation of the Biomar software at Lincoln ended up causing NCFE to lose more money or lose less money than it would have otherwise?"

Do you see that question, sir?

A. Yes.

Q. And your answer was: "No. No analysis was ever done in that context."

Do you see that answer, sir?

A. Yes, I do.

Q. Were those answers true and correct at the time you gave them?

A. Well, I think in all fairness, we should probably start at the beginning again and you should give me one question at a time.

Q. Was the answer, no, no analysis was ever done on that context, Page 278, Line 20, was that a true and correct answer at the time you gave it?

A. I didn't have to perform an analysis, no.

Q. Well, sir, the question was: "Did you make any determination as to whether or not the installation of the software at Lincoln ended up causing NCFE to lose more money or lose less money than it would have otherwise?"

And your answer, sir, was "No." Right?

A. That's correct. But to be—to clarify, I think that still remains to be seen.

As I stated in this morning's testimony, you know, the goal at NCFE was to capture dat[a]. We were able to do that very well with the Biomar system.

We were able to store their data on our systems. We had mirror systems at Biomar. Whether that actually brought value to NCFE at a later date is a question for a later date, and clearly would never be answered at this point.

But as I stated earlier, the goals were met. We had better data. We had complete data for billing purposes, and we had the potential of a database that had value to third parties.

*Id.* at 137–139. The Court also questioned Mr. Speer following his examination by counsel, for further clarification on the im-

pact that the Biomar system may have had on NCFE's finances:

Q. Well, then, did the eligible accounts receivable increase then after-you testified the difference between the submitted gross receivables and those considered eligibles for lending or reimbursement. Did they increase, the eligible accounts?

A. That answer is a little more complex because it depends on the circumstances.

. . . .

And so, you know, as I mentioned in my testimony, the complexity of medical billing is very extensive, and the actual payment of an invoice, you know, can vary based on all kinds of variables to include who is going to pay it and what charges were actually submitted.

Q. So then did National Century obtain an increase in revenues as a result of capturing these new charges?

A. Yes. Directly related to new charges, we would have had a larger outstanding balance for that relationship, in theory.

And so if more receivables were created, more receivables would have been purchased, more receivables then would have been subject to a finance fee and, therefore, more earnings would have been recognized by National Century.

Q. That brings me then to really the basis of the preceding questions, is: How did the collection percentage change after this system?

A. That, I can't give a specific answer because I'm not familiar with the detail.

Generally speaking, if you improve your billings, gross and eligible, your collections should follow suit and also improve. I don't recall, and I wasn't tracking collections that closely to recall

whether that was an accurate fact with this particular installation and hospital. Vol. III at 172–175.

### 2. Clinica Medica Familiar

In April 2002, according to Mr. Jennings, NCFE paid Biomar $250,000.00 relating to software licenses and services for the five Los Angeles area healthcare clinics known collectively as Clinica Medica Familiar. *See* Vol. I at 58–60. Mr. Martia and Mr. Speer admitted that there was no contract, no loan, and no lease among any of the parties to this asserted arrangement. *See id.* at 87; Vol. III at 123. After nearly a year of installation work at the Clinics, they confirmed that the Biomar system went on-line at only one of the five clinics. *See* Vol. II at 10–11; Vol. III at 52.

Biomar asserts, in its amended proof of claim, that NCFE should pay Biomar an additional $315,000.00 for work allegedly done by Biomar in getting ready for installation of the software at the Clinics (seven monthly "maintenance" payments of $45,000.00). Mr. Martia acknowledged that NCFE never agreed to pay these fees and it was the Clinics' responsibility to make these payments. *See* Vol. I at 209; Vol. II at 46, 55, 77, 79.

### 3. VillaView Hospital.

Biomar asserts, in its amended proof of claim, that it is owed $180,000.00 from NCFE for services allegedly provided to VillaView. Mr. Jennings testified that NCFE did not agree to pay Biomar for software and services for VillaView. *See* Vol. I at 87. Mr. Martia and Mr. Speer's testimony do not contradict Mr. Jennings' contention regarding VillaView. *See* Vol. I at 213–14; Vol. III at 62–63, 123–24. And, Mr. Speer acknowledged that VillaView never even agreed to install the Biomar system. *See* Vol. III at 123.

## III. Arguments of the Parties

Plaintiff asserts that NCFE did not receive reasonably equivalent value for its payments to Biomar on behalf of Lincoln Hospital and the Clinics. Plaintiff seeks avoidance and recovery of the payments that NCFE made to Biomar relating to Lincoln Hospital and the Clinics, totaling $608,000.00, as fraudulent transfers. Plaintiff also seeks an order sustaining its objection to Biomar's proof of claim. Plaintiff argues that NCFE also did not receive reasonable equivalent value even close to the amount of the obligation listed in the claim. Biomar reduced its claim to $495,000.00 relating to services Biomar says it provided the Clinics and VillaView. Plaintiff also asserts that claim should be disallowed because NCFE never agreed to pay Biomar for the services performed at VillaView or the "monthly maintenance" fees at the Clinics.

Biomar argues that it reached an agreement with NCFE to perform work at Lincoln Hospital and the Clinics; as for VillaView, Biomar maintains it began work on an information system at NCFE's request. Biomar contends that it performed all the work at these facilities in good faith. Relying on the testimony of Mr. Martia and Mr. Speer, Biomar asserts that NCFE indeed received reasonable equivalent value for the services Biomar performed at Lincoln Hospital, the Clinics, and VillaView. Biomar also disputes whether NCFE was insolvent when Biomar installed these systems at the third-party healthcare facilities.

## IV. Law and Analysis

### A. Evidentiary Issues

#### 1. Plaintiff's Exhibits

Plaintiff submitted 40 exhibits for admission at trial. Biomar lodged objections to Plaintiff's Exs. 6 and 7; therefore, Plaintiff's other 38 exhibits are admitted without objection. Plaintiff offered a declaration of John Carvelli as Plaintiff's Ex. 6. *See* Vol. I at 160. This declaration was originally submitted in Lincoln Hospital's bankruptcy case, in support of the Debtor Lincoln Hospital's Motions (1) to Approve Sale of Substantially All of the Debtor's Assets Free and Clear of Liens and Interests and to Approve Related Overbid Procedures; and (2) to Assume and Assign Unexpired Leases and Executory Contracts. *See id.; see also* Plaintiff's Ex. 6, ¶ 1. John Carvelli was the President and Chief Executive Officer of Lincoln Hospital. *See* Plaintiff's Ex. 6, ¶ 1.

The substance of Mr. Carvelli's declaration is relevant to this trial because in it, Mr. Carvelli states that (i) Lincoln Hospital's primary source of revenue was generated by the sale of accounts receivable to subsidiaries of NCFE, *id.* ¶ 4; (ii) Lincoln Hospital was entirely dependent on the sale of its receivables to NCFE subsidiaries to continue operating, *id.* ¶ 5; (iii) NCFE's subsidiaries asserted a claim against Lincoln Hospital in excess of $115 million, *id.* ¶ 7; (iv) Lincoln Hospital's post-petition lender collected only approximately $254,864.57 on pre-petition receivables, *id.* ¶ 8; (v) representatives of Lincoln Hospital contacted potential purchasers in the relevant market and healthcare industry to try to sell Lincoln Hospital, *id.* ¶¶ 11, 22; (vi) none of the potential purchasers offered an amount in excess of the amount already owed to Lincoln Hospital's post-petition lender—$3,089,866.67, *id.* ¶¶ 9, 11; and (vii) the amount owed to the post-petition lender was equivalent to the true market value of Lincoln Hospital, *id.* ¶ 21.

Biomar's objection to the admission of this declaration as hearsay is without merit. This declaration is expressly excluded from hearsay by Federal Rule of

Evidence 801(d)(2)(B) as a party admission. Rule 801(d)(2)(B) provides in pertinent part that a statement is not hearsay if "[t]he statement is offered against a party and is ... a statement of which the party has manifested an adoption or belief in its truth[.]" Fed.R.Evid. 801(d)(2)(B). This declaration is an adoptive admission of Biomar because Biomar offered this declaration in support of its summary judgment reply brief in this adversary proceeding. *See* Biomar Technologies, Inc.'s Reply Brief in Support of its Motion for Summary Judgment (Doc. 54) at 13; Supplemental Affidavit of David J. Richardson (Doc. 55), Ex. C.

By asking this Court to enter judgment on its claims in this adversary proceeding based in part on the truth of the matters asserted in the declaration, Biomar "manifested an adoption or belief in its truth" for the purposes of Rule 801(d), making the declaration admissible at trial. *See U.S. v. Morgan,* 581 F.2d 933, 937–38 (D.C.Cir.1978) (affidavit admissible against government as adoptive admission where government manifested belief in truth of affidavit when government submitted the same affidavit in pre-trial proceedings); *Buckley v. Airshield Corp.,* 116 F.Supp.2d 658, 664 (D.Md.2000) (affidavits submitted to court by defendants in prior case admissible against defendants as adoptive admissions in present case). For these reasons, the Court overrules Biomar's objection and admits Plaintiff's Ex. 6 into evidence.

■ Turning to Biomar's objection to Plaintiff's Ex. 7, the Court finds it similarly lacks merit. Plaintiff's Ex. 7 consists of a chart comparing Lincoln Hospital's submitted gross receivables, eligible receivables and collections for four different periods, both before and after installation of the Biomar system at Lincoln Hospital. *See* Vol. I at 80. Charles Jennings provided the numbers that were used in the preparation of the chart. *See id.* at 93. Mr. Jennings obtained the numbers in the chart from a review of voluminous records of NCFE including Huntington bank deposit statements and an extensive computer database. *See id.* at 125–27. Mr. Jennings then cross-checked the numbers in the chart against approximately 15 to 20 additional documents. *See id.* at 127.[5]

Mr. Jennings testified that, based on his review of the computer database and other records at NCFE, the eligible receivables, *i.e.,* the receivables which NPF XII (a NCFE related entity) could purchase under the terms of its indentures, did not show any material change after installation of the Biomar system. *See id.* at 80–85. Mr. Jennings also testified that there was no increase in collections in Lincoln Hospital's lockbox account after installation of the Biomar system. *See id.* at 85–86.

The Court finds that Plaintiff's Ex. 7 is admissible under Federal Rule of Evidence 1006. Rule 1006 provides that, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court." Fed.R.Evid. 1006.

The chart summarizes the contents of an extensive electronic database and other

---

**5.** In his nearly 10 years with NCFE, Mr. Jennings explained that he spent the bulk of his time working with attorneys around the country, gathering data, analyzing data and explaining it to the company's attorneys. After NCFE declared bankruptcy, Mr. Jennings assisted the then management team until December 2004 by obtaining and analyzing data regarding NCFE's past and present operations. *See* Vol. I at 36–38.

documents such as bank records. *See* Vol. I. at 125–27, 164; *see also* Vol. III at 140–41, 151. Additionally, the documents and computer records supporting the chart are themselves admissible as business records under Fed.R.Evid. 803(6). Finally, NCFE's books and records were made available to Biomar for more than a year prior to the trial, and according to Plaintiff, Biomar showed no interest in reviewing documents relating to Lincoln Hospital's reported receivables or collections. *See* Vol. I at 164.

Lastly, Plaintiff relied on a summary of collections received in the Lincoln Hospital lockbox derived from the very same computer database in its motion for summary judgment. *See* Doc. 46, Ex. A. Thus, Biomar was on notice as of at least January 2005 that the Plaintiff intended to rely on a summary of the electronic evidence of collections in Lincoln Hospital's lockbox, yet Biomar apparently still made no request to review the computer database. For these reasons, the Court overrules Biomar's objection and admits Plaintiff's Ex. 7 into evidence.

### 2. Biomar's Exhibits

Plaintiff objects to a number of exhibits proffered by Biomar because they are allegedly hearsay and do not satisfy the business records exception to the hearsay rule. *See* Doc. 89. Plaintiff's objection rests on the premise that the exhibits in question are hearsay in the first place. Biomar contends the objected to exhibits are not hearsay because they are not offered for the truth of their contents. *See* Doc. 91.

The objected to exhibits will only constitute hearsay if they are "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Biomar claims the exhibits to which Plaintiff objects are not offered to prove the truth of their contents. For example, Biomar is not asserting that a particular server configuration was acceptable with the addition of a tape backup (Defendant's Ex. I), that Lincoln Hospital requested additional workstations at one point (Defendant's Ex. Y), or that a particular personal computer was to be shipped directly to Biomar (Defendant's Ex. P). Rather, Biomar asserts that these exhibits at issue are offered to demonstrate a course of conduct between all of the parties involved.

The Court accepts Biomar's position that the exhibits to which Plaintiff has objected are not offered for their truth, but instead to show a course of conduct between the parties; thus, the Court finds that the Biomar exhibits at issue are not hearsay. *See U.S. v. Tokars*, 95 F.3d 1520, 1535–36 (11th Cir.1996) (statements offered "to explain the course of conduct do not constitute hearsay at all"); *U.S. v. Parillo*, 1992 WL 179243, at *4 (6th Cir. July 28, 1992) ("Since the purpose of the hearsay was admitted to explain Mackin's course of conduct and not to prove the illegality of Parillo's conduct, the trial court's ruling was not clearly erroneous"); *Williams v. Gen. Motors Corp.*, 18 Fed. Appx. 342, 348 (6th Cir.2001) (statement offered "not for the truth of the matter asserted, but in order to show Roberts' course of conduct . . . was not hearsay at all.").

Because the exhibits to which Plaintiff objects are not offered for their truth, they are not hearsay in the first instance. Therefore, the Court admits those exhibits, but only for the purpose of showing a course of conduct between the parties and not for the truth of the matter asserted in them. Biomar's other exhibits to which there was no objection are also admitted.

### B. Fraudulent Transfers

Plaintiff seeks to avoid a total of $608,000.00 in alleged pre-petition fraudu-

lent transfers to Biomar ("Transfers") under sections 544(b) and 548(a)(1)(B) of the Bankruptcy Code, and recover the Transfers, or the value thereof, under section 550. The avoidance power is afforded to Plaintiff as debtor in possession because fraudulent transfers diminish the assets of the debtor to the detriment of all creditors. *See Enwotwen Indus., Inc. v. Brookstone Ltd. P'ship (In re Newtowne, Inc.)*, 157 B.R. 374, 378 (Bankr.S.D.Ohio 1993) (internal quotation marks and citations omitted). Section 544(b) of the Bankruptcy Code incorporates the state fraudulent transfer laws by providing that:

> the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). Under section 544(b), Plaintiff may avoid any fraudulent transfers that could have been avoided by a creditor of the Debtors under applicable law, in this case the Ohio Uniform Fraudulent Transfer Act. *See* Ohio Rev.Code Ann. §§ 1336.01–1336.11 (West 2004). Section 1336.04 of the Ohio UFTA provides in pertinent part:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
>
> . . .
>
> (2) Without receiving a reasonably equivalent value in exchange for the

transfer or obligation, and if either of the following applies:

> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
>
> (b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code Ann. § 1336.04. The Ohio UFTA has a four-year reach-back period for the types of fraudulent transfers described in § 1336.04. *See* Ohio Rev.Code Ann. § 1336.09.

■ Similarly, section 548 of the Bankruptcy Code sets forth the powers of a trustee or debtor in possession [6] in bankruptcy to avoid fraudulent transfers. It permits the debtor in possession "to set aside transfers that are tainted with actual fraud and certain other transfers, commonly referred to as constructively fraudulent transfers." *Sensenich v. Molleur (In re Chase)*, 328 B.R. 675, 678 (Bankr.D.Vt. 2005) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556, *reh'g denied*, 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994)). "Section 548 permits avoidance if the [debtor in possession] can establish (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) that the debtor received 'less than a reasonably equivalent value' in exchange for such transfer." *Id.* at 678–79 (quoting 11 U.S.C. § 548(a)(1)(B)) (other

---

6. In a Chapter 11 context, these powers are also available to the debtor in possession pursuant to § 1107(a). Plaintiff, being the successor in interest to the debtor in possession, can utilize these powers.

citation omitted). Section 548(a)(1)(B) states, in pertinent part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(b). *See also Turner v. JPB Enters., Inc. (In re Maine Poly, Inc.)*, 317 B.R. 1, 8 (Bankr.D.Me.2004) ("[T]o succeed in [an] action under § 548(a)(1)(B), [one] must show that '(1) a transfer was made, (2) the transferred property belonged to the debtor, (3) the transfer was made within one year prior to the filing of the petition, (4) the transfer was made for less than equivalent value, and (5) at a time the debtor was insolvent or was made insolvent by the transfer.'" (internal citation omitted)); *Newtowne*, 157 B.R. at 378 ("A trustee or debtor-in-possession may avoid a debtor's transfer of property made within one year of the filing

of a bankruptcy petition if: (1) the debtor 'received less than a reasonably equivalent value in exchange for such transfer' and; (2) the debtor was insolvent at the time of the transfer or rendered insolvent by the transfer." (citation omitted)).

■ Thus, under applicable law,[7] Plaintiff must prove three things in order to establish that the Transfers can be avoided as fraudulent transfers. First, Plaintiff must show that NCFE transferred its property to Biomar. Second, Plaintiff must prove that NCFE did not receive "reasonably equivalent value" in exchange for the Transfers. Third, Plaintiff must show that NCFE was insolvent at the time of the Transfers. Plaintiff has the burden of establishing its fraudulent transfer claims.

■ The Code separates the avoidance of a fraudulent transfer from the recovery of a fraudulent transfer. *See Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1196 (7th Cir.1989). Once the grounds for setting aside a transfer are met, the debtor in possession faces the second hurdle of establishing a means of recovery under § 550(a), the remedies section, which requires the trustee to identify a specific category of persons from whom recovery of the fraudulent transfer may be had. *See Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent), Inc.*, 307 B.R. 744, 749–50 (Bankr.S.D.N.Y.2004). Section 550 restricts the debtor in possession to recovery of the avoided transfer, or its value, from the initial and subsequent transferees and the entities for whose benefit the transfer was made. *See id.*

### 1. Biomar's Receipt of the Transfers from NCFE

In October 2001, NCFE paid Biomar $50,000.00 for a software license for Lin-

---

7. The parties do not dispute that the Transfers occurred within the reach-back periods.

coln Hospital, and an initial installation fee of $32,000.00. *See* Plaintiff's Ex. 1; Vol. I at 63. NCFE made three additional payments of $32,000.00 for installation of the software at Lincoln Hospital. *See id.* Thereafter, beginning in January 2002, NCFE paid Biomar a monthly fee of $20,000.00. *See id.* at 63–64. The total amount of payments made by NCFE to Biomar for the software system at Lincoln Hospital was $358,000.00. *See id.* at 64.

In April 2002, NCFE paid Biomar $250,000.00 relating to software licenses and services for the Clinics. *See* Plaintiff's Ex. 1; Vol. I at 58–60. Of this amount, $200,000.00 was for license fees and $50,000.00 was for installation. *See id.* at 60–64. All of the funds NCFE transferred to Biomar, *i.e.*, the Transfers, constituted property of NCFE. Additionally, the Transfers went to Biomar directly—thus, Biomar was the "initial transferee" of the Transfers.

Thus, the Court finds that Biomar received a total of $608,000.00 from NCFE for software licenses and services that Biomar provided to the third-parties Lincoln Hospital and the Clinics. Biomar has admitted receiving these payments. Thus, Plaintiff has proved the first element of its claim for avoidance of the Transfers.

### 2. NCFE did not Receive Reasonable Equivalent Value for the Transfers

 The second element Plaintiff must prove is that NCFE did not receive reasonably equivalent value for the Transfers. "To assess whether a challenged transfer is supported by reasonably equivalent value, 'courts generally compare the value of the property transferred with the value of that received in exchange for the transfer.'" *Dayton Title Agency, Inc. v. White Family Cos., Inc. (In re Dayton Title Agency, Inc.)*, 292 B.R. 857, 874

(Bankr.S.D.Ohio 2003) (quoting *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir.1999)). Although there does not have to be a "penny-for-penny" exchange, "courts should keep the equitable purposes behind fraudulent transfer law in mind, recognizing that any significant disparity between the value received and the value surrendered will significantly harm innocent creditors." *Id.* "Case law has determined that what amounts to 'reasonably equivalent value' under the statute depends on the facts and circumstances of the case. Value has been defined as that which provides an economic benefit, either directly or indirectly to the debtor." *Schilling v. Montalvo (In re Montalvo)*, 333 B.R. 145, 150 (Bankr.W.D.Ky.2005). "Whether a transfer is made for reasonably equivalent value is a question of fact to be determined from all the evidence in a particular case." *Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 162 (Bankr.N.D.Ohio 2002).

 Because the Transfers in question here crucially involve third-parties-Lincoln Hospital and the Clinics-who clearly received the *direct* benefit of Biomar's software goods and services, this Court must determine the value of any *indirect* benefit flowing to the Debtors for the payments made to benefit the third-parties. "If the debtor directly receives value for the transferred property, the court only needs to compare the value received with the value given up by the debtor." *Newtowne*, 157 B.R. at 378.

 Where, as here, the Transfers involve third-parties, the analysis is more complicated, "because the benefit to the debtor may be harder to trace." *Id.* In measuring the value of any benefits received, "[t]he focus always is on the economic benefit, if any, flowing to the debtor as a result of the transfer." *Id.* at 379 (internal citations omitted). In fact, as a

general rule, courts have held that "the debtor must receive the value of the transfer, not some third party." *See Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 997 (Bankr.S.D.Ohio 1990).

Judge Sellers in *Newtowne* identified the three situations in which courts have found that a debtor received reasonably equivalent value in a third-party transfer. First, there is the situation where the debtor's payment of a third-party's debt discharges the debtor's own debt to the third-party. *See Newtowne*, 157 B.R. at 379. However, in the situation where no corresponding obligation of the transferor is discharged, courts have not hesitated to avoid transfers made to satisfy the debt of a third party. *See, e.g., Dietz v. St. Edward's Catholic Church (In re Bargfrede)*, 117 F.3d 1078, 1079–80 (8th Cir.1997) (debtor's transfer to church to pay debt of embezzling wife avoidable). That is not the case here, as NCFE did not owe either Lincoln Hospital or the Clinics a debt that could be discharged by NCFE's payments to Biomar—to the contrary, they were indebted to the Debtors for millions of dollars.

Second, there is the situation where the "debtor and the third party are so related or situated that they share an identity of interests because what benefits one will, in such a case, benefit the other to some degree." *Newtowne*, 157 B.R. at 379 (quoting *Pembroke Dev. Corp. v. Commw. Sav. & Loan (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400 (Bankr.S.D.Fla.1991)). This scenario also does not apply. Although Lincoln Hospital was indirectly owned by the four NCFE founders, NCFE itself had no ownership interest in either Lincoln Hospital or the Clinics. There is no value to NCFE's creditors for payments that may have benefitted the founders' other business interests.

Finally, "where a debtor enjoys the benefits of the goods or services it bought for its principal, the transfer of money for those goods or services may not be avoided." *Newtowne*, 157 B.R. at 379; *see also, e.g., Butz v. Sohigro Serv. Co. (In re Evans Potato Co.)*, 44 B.R. 191, 194 (Bankr.S.D.Ohio 1984) (debtor received reasonably equivalent value when it paid for goods ordered by owner because goods were delivered to debtor and debtor had exclusive use of goods). The Court must undertake an analysis of whether this third category of indirect benefits that Judge Sellers described applies to the case at bar. Even though the software was not installed at NCFE and was not used by NCFE employees in the operation of NCFE's business, Biomar still argues that NCFE received value from the Transfers since NCFE enjoyed the benefits of Biomar's systems installed at Lincoln Hospital and one Clinic. Conversely, Plaintiff argues persuasively that NCFE received nothing of concrete or quantifiable value from Biomar in exchange for the Transfers.

The Court notes that "courts have been willing to consider indirect benefits received by a debtor [but only] if those benefits are *fairly concrete*." *Harker v. Ctr. Motors, Inc. (In re Gerdes)*, 246 B.R. 311, 314 (Bankr.S.D.Ohio 2000) (emphasis added). In *Dayton Title*, Judge Clark reiterated this point from *Gerdes*, stating "the economic value of any indirect benefits must be fairly concrete and quantifiable to merit consideration by the court." *Dayton Title*, 292 B.R. at 875 (citing *SPC Plastics Corp. v. Griffith (In re Structurelite Plastics Corp.)*, 224 B.R. 27, 31 (6th Cir. BAP 1998)) (noting that the speculative value of indirect benefits like the opportunity to acquire additional loans or new managerial talent does not constitute fair consideration) (other citation omit-

ted).[8] *See also Clark v. Sec. Pac. Bus. Credit (In re Wes Dor, Inc.)*, 996 F.2d 237, 243 (10th Cir.1993) ("To the extent indirect benefits could be considered ... the Bank fails to point to any evidence quantifying the amount of such benefits."); *Stillwater Nat'l Bank and Tr. v. Kirtley (In re Solomon)*, 299 B.R. 626, 638 (10th Cir. BAP 2003) (finding that indirect benefits that cannot be quantified do not constitute "value," under constructive fraudulent transfer provisions of Oklahoma law or the Bankruptcy Code); *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 613 (8th Cir. BAP 2001) ("If the benefits are indirect, they must be 'fairly concrete.'" (citation omitted)); *Official Comm. of Unsecured Creditors of Crystal Med. Prods., Inc. v. Pedersen & Houpt (In re Crystal Med. Prods., Inc.)*, 240 B.R. 290, 300 (Bankr. N.D.Ill.1999) (same); *Coan v. Fleet Credit Card Servs., Inc. (In re Guerrera)*, 225 B.R. 32, 36 (Bankr.D.Conn.1998) (To constitute "reasonably equivalent value" for alleged fraudulent transfer in payment of third party's debt "any indirect benefit received must be 'fairly concrete.'") (quoting *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 578 (7th Cir.1998)).

### a. Burden of Production to Show Indirect Benefit

■ Before analyzing what indirect benefits NCFE received, if any, in exchange for the Transfers, the Court turns to the allocation of the burden of produc-

tion on this issue. In a three-way transfer like this one, once the plaintiff has shown that the transfer was for the benefit of a third-party, as Plaintiff here has done, courts place the burden on the defendant to prove that the debtor received "reasonably equivalent value" indirectly as a result of the transfer. In *First Nat'l Bank in Anoka v. Minn. Utility Contracting, Inc. (In re Minn. Utility Contracting, Inc.)*, 110 B.R. 414, 419 (D.Minn.1990), the court affirmed the decision of the bankruptcy court shifting the burden of production onto the defendant in a third-party transfer context. The defendant had argued that the bankruptcy court erred in shifting the ultimate burden of proof of "reasonably equivalent value" onto the defendant. The court disagreed, noting that the plaintiff had satisfied its burden by proving that it did not receive a direct benefit for the transfers—once established, the defendant must meet that proof with evidence of an indirect benefit to the plaintiff:

> While the bankruptcy court did state that it was placing the "burden of proof regarding equivalent value" on the Bank, it later explained this statement when it said that it was placing upon the trustee the burden of producing evidence that it did not receive "direct" consideration, and then shifting to the Bank the burden to prove that Leasing received *indirect* consideration. Thus, it is clear that the bankruptcy court never truly shifted the ultimate burden of

---

8. In *Dayton Title*, Judge Clark held that the defendants did not attempt to measure or quantify the economic value of the plaintiff title agency's continued relationship with Chari, a real estate broker. Instead, defendants only speculated, *without evidentiary support*, that the value of Dayton Title's ongoing relationship with Chari was reasonably equivalent to the $4,142,151.38 loss experienced by Dayton Title (when Chari trans-

ferred this money to defendants from title agency's trust account) forcing it to close its doors and seek bankruptcy protection. *See id.* Judge Clark found this assertion too speculative to merit consideration. Consequently, Judge Clark concluded that the plaintiff title agency received no reasonably equivalent direct or indirect benefit for the $4,142,151.38 transferred to defendants. *See id.*

proof on the issue to the Bank. Rather, it required the debtor to produce evidence that it received no direct benefit for the pledge of assets. Leasing having done so by showing that the loan proceeds went to a third party, the bankruptcy court then required the Bank to meet this evidence with some proof that Leasing received an indirect benefit from the loan.

*Id.* at 419 (emphasis in original). The court then rejected the defendant's argument that "since, at the time of the transfer Contracting [the third-party beneficiary] accounted for most of Leasing's [the transferor's] business, the infusion of additional cash into Contracting necessarily generated additional business for Leasing, and this additional business constituted reasonably equivalent value for the pledge." *Id.* at 420. In a ruling that is particularly instructive in this case, the district court held that the "promise of continued business" between the transferor and the third party beneficiary was not sufficient, as the defendant had produced " 'no evidence that the advance did in fact result in additional business to Leasing, or, if so, how much additional business.' " *Id.* (citation omitted).

Many courts have followed *Minn. Utility,* holding that once a plaintiff has established that consideration for the transfer passed to a third-party, the burden of demonstrating and quantifying reasonably equivalent value for the transfer shifts to the defendant. *See, e.g., Wes Dor,* 996 F.2d at 243 (noting defendant "fails to point to any evidence quantifying the amount of such [indirect] benefits"); *Braunstein v. Walsh (In re Rowanoak Corp.),* 344 F.3d 126, 131–32 (1st Cir.2003) ("[o]nce the Trustee establishes his prima facie case, he need not affirmatively disprove every other potential theory") (affirming district court's finding third-party transfers fraudulent in absence of documentation of loan);

*Richards & Conover Steel,* 267 B.R. at 614 ("party claiming to have delivered value must quantify it."); *Commerce Bank of Kansas City, N.A. v. Achtenberg* 1993 WL 476510, *3 (W.D.Mo. Nov.10, 1993) ("[T]he court's rationale in *Minnesota Utility* is well reasoned and fully supported by other courts and commentators interpreting § 548(a)(2)."); *Dayton Title,* 292 B.R. at 875 ("[w]hile goodwill and the continuation of business relationships can be indirect benefits to a business debtor, [the defendants] have not attempted to measure or quantify the economic value of Dayton Title's continued relationship with Chari."); *Leonard v. Mountainwest Fin. Corp. (In re Whaley),* 229 B.R. 767, 775 (Bankr. D.Minn.1999) (where immediate benefit from transfer goes to third party, burden shifts to transferee to show debtor received indirect benefit that was "both tangible and of concrete economic value"); *Leonard v. First Commercial Mortgage Co. (In re Circuit Alliance, Inc.),* 228 B.R. 225, 231 (Bankr.D.Minn.1998) (when trustee establishes transfer was made on account of third party's debt or obligation, burden shifts to defendant to demonstrate debtor received benefit that was "tangible, of concrete economic value, and reasonably equivalent to what the debtor gave up."); *Leonard v. Norman Vinitsky Residuary Trust (In re Jolly's Inc.),* 188 B.R. 832, 843 (Bankr.D.Minn.1995) (once proven that consideration for transfer went directly to third party, defendant seeking shelter of "indirect benefit" defense bears " 'intermediate' burden *of production* as to the concreteness of the indirect benefit, and its reasonable equivalence in value." (emphasis in original)); *Newtowne,* 157 B.R. at 380 ("[defendant] neither suggested nor presented evidence establishing any genuine factual issue of economic benefit to Enwotwen as a result of the transfer of the Property.").

■ The Court finds that Plaintiff satisfied its initial burden of proof by proving that NCFE did not receive reasonably equivalent value by showing that the consideration for the Transfers went directly to third-parties Lincoln Hospital and the Clinics. *See Dayton Title*, 292 B.R. at 875. Moreover, Plaintiff went beyond its burden by affirmatively proving that NCFE did not receive reasonable equivalent value by showing that although Lincoln Hospital's indebtedness to NCFE subsidiaries increased by approximately $27 million after the Transfers began in 2001, the collections flowing into Lincoln Hospital's lockbox did not increase, and the eligible receivables that NCFE could purchase from Lincoln Hospital also did not change materially. *See* Vol. I at 47–50, 80–86.

The undocumented "promise to pay" by Lincoln Hospital to NCFE also did not constitute a benefit to NCFE. Even if NCFE did receive an undocumented "promise to repay" from Lincoln Hospital, this promise was worthless due to Lincoln Hospital's own insolvency at the time, a fact well known to Biomar, as shown by Mr. Martia's insistence that NCFE agree to pay Biomar instead of having Lincoln Hospital do so. Courts have held that transfers made to benefit an insolvent third-party do not offer the possibility of providing reasonably equivalent value to the transferee. Any "promise to pay" offered by Lincoln Hospital to NCFE did not offer a legitimate and reasonable chance of return and was thus of no value. *See, e.g., Cent. Bank of Cleveland v. Coleman (In re B–F Bldg. Corp.)*, 312 F.2d 691, 694 (6th Cir.1963) ("worthless" demand promissory note issued by insolvent entity did not provide reasonably equivalent value). *See also Frank v. Kiesel (In re Denison)*, 292 B.R. 150, 154 (E.D.Mich. 2003) ("[A] future return on an investment could constitute 'reasonably equivalent value' for the initial purpose, [but] there must

be some 'legitimate and reasonable' chance of return.") (quoting *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3rd Cir.1996)).

Thus, Biomar bears the burden of production to show that NCFE received a concrete, quantifiable, and tangible indirect benefit that was reasonable equivalent to the $608,000.00 cash value of the Transfers. This is a burden that Biomar has failed to satisfy.

### b. NCFE did not Receive Concrete, Quantifiable Indirect Benefits that were Reasonably Equivalent to the Transfers

■ The Court finds that Biomar failed to meet its burden of production to prove that NCFE received an indirect benefit from the Transfers that was concrete, quantifiable and reasonably equivalent in value to the Transfers. In fact, Biomar provided no evidence of any concrete quantifiable benefit to NCFE. Although Mr. Martia and Mr. Speer did their utmost to extol the virtues of the Biomar system and to speculate about potential advantages the software might have yielded at some unspecified future date, Biomar never identified a single dollar's worth in value that returned to NCFE as a result of its payments to Biomar—let alone $608,000.00 worth.

Reviewing Biomar's evidence and witnesses, Mr. Speer discussed the financial impact that the Biomar system may have had upon NCFE. When asked if there were positive trends in the receivable amounts following the installation of the Biomar system at Lincoln Hospital, Mr. Speer answered affirmatively, but he prefaced that answer stating, "I didn't do any follow-up work to determine independently that the information was accurate." Vol.

III at 83. Then he qualified his answer stating, "I didn't do any deep analysis. I didn't perform any diligence or background work with respect to the numbers." *Id.* This testimony hardly qualifies as concrete or quantifiable.

Biomar provided no evidence—testimonial or documentary—to the Court demonstrating concrete quantifiable numbers to show that the Biomar system enabled NCFE to purchase more receivables from Lincoln Hospital, which would naturally increase NCFE's revenues through increased finance fees. Mr. Speer merely testified that NCFE's revenues would have increased due to the Biomar installation at Lincoln; he failed to testify as to the amount those revenues would have increased. Mr. Speer even admitted in his deposition that no analysis was ever done on the impact that the Biomar system had on NCFE's bottom line. *See* Vol. III at 137–38.

After being questioned by counsel for Plaintiff concerning his deposition testimony, Mr. Speer admitted that the Biomar system's impact on NCFE's finances "still remains to be seen." *Id.* at 138. Mr. Speer also emphasized that NCFE had a better database with more complete data due to the Biomar system, but again he hedged on its impact saying, "[w]hether that actually brought value to NCFE at a later date is a question for a later date, and clearly would never be answered at this point." *Id.* at 139.[9]

Upon questioning by the Court, Mr. Speer continued to sidestep the issue of the Biomar system's impact on NCFE's revenues. When asked if the eligible receivables that NCFE could actually purchase from Lincoln Hospital increased (which would also add to NCFE's revenues through heightened fees) after the installation of the Biomar system, Mr. Speer said "[t]hat answer was a little more complex because it depends on the circumstances." Vol. III at 172–73. Mr. Speer also said that NCFE's revenues would have increased "in theory" as a result of the Biomar system; plus, he was not sure of the impact the system would have had on the percentage of receivables collected. *See id.* at 174–76. In all, Mr. Speer's testimony consists of vague, nebulous answers that depend on circumstances, some of which will be determined at a later time. Mr. Martia's testimony can be similarly characterized as puffery without detail.

▮▮▮ In fact, even in its post-trial brief, Biomar put forth the same unpersuasive position that NCFE likely would have received vague and amorphous benefits, at some undetermined future time, as a result of the Transfers. *See* Docs. 86, 91 (presenting no citation to the record of concrete, quantifiable benefits that accrued to NCFE as a result of the Transfers). Overall, based on all the filings before the Court and record evidence adduced at trial, the Court determines that Biomar presented no evidence that the installation of its system at Lincoln Hospital or at the single Clinica Medica Familiar site provided any concrete, quantifiable or tangible indirect economic benefit to NCFE.[10]

---

9. Mr. Speer also speculated that an enhanced database with patient and billing information had some unspecified value to third parties. *See* Vol. III at 138–39. Plaintiff points out that even this vague claim could be dubious given that marketing a huge database of confidential medical information could run afoul of the Health Insurance Portability and Ac-

countability Act of 1996 ("HIPAA"), Pub.L. 104–191, and its related privacy rule, 65 F.R. 82462, which impose strict limitations on the disclosure of individually identifiable medical information.

10. Biomar's assertion that it is entitled to a good faith defense lacks merit because Biomar did not give value to NCFE for the Trans-

**220**

Thus, Biomar failed to meet its burden under the standard imposed by Judge Clark and other courts that the "economic value of any indirect benefit must be fairly concrete and quantifiable to merit consideration by the court." *Dayton Title,* 292 B.R. at 875. In the final analysis, Biomar's speculations of vague and intangible indirect benefits to NCFE is unavailing to the Court. The Transfers left NCFE's cash account prior to its Chapter 11 filing and went to Biomar. Nothing of any concrete value to NCFE's creditors ever returned.

The Court finds that Plaintiff has shown that the Debtors received "less than a reasonably equivalent value" in return for the Transfers to Biomar. Thus, Plaintiff has proved the second element of its claim for avoidance of the Transfers.

### 3. NCFE Was Insolvent at the Time of the Transfers

■ Biomar contested insolvency, but it did not offer any affirmative evidence that NCFE was solvent at the time of the Transfers. At trial, Plaintiff called Jeffrey Benton, a CPA and managing director of FTI Consulting, one of the professionals this Court appointed to represent the Debtors post-petition, to testify concerning the Debtors' true financial condition at the time of the Transfers. *See* Vol. I at 129–32. Mr. Benton described the work he had done in restating the Debtors' financial statements in order to seek tax refunds. *See id.* at 133–45. Mr. Benton

testified that the financial statements prepared by the company pre-petition overstated the value of NPF XII's receivables by around $2 billion to $2.5 billion. *See id.* at 134–35. Moreover, the pre-petition 2001 consolidated financial statement erroneously reflected NCFE as having a positive shareholder equity of approximately $93 million, mostly as a result of an asserted investment value of $185 million in its subsidiaries, NPF VI and NPF XII. *See id.* at 137. However, when the actual value of NCFE's ownership interests in NPF VI and NPF XII were taken into account, through a write-down of around $2.4 billion in worthless receivables, NCFE's investment in subsidiaries was actually zero, meaning that, as of December 31, 2001, NCFE was insolvent. *See id.* at 139–40.

Similarly, Mr. Benton testified that the company's pre-petition consolidated financial statement for 2000 was also erroneous and, when restated, revealed that NCFE was already insolvent by over $100 million as of December 31, 2000. *See id.* at 142. In short, Mr. Benton testified that NCFE, NPF VI, NPF X and NPF XII were all insolvent on a balance sheet basis from at least December 31, 2000 continuously through the Petition Date. *See id.* at 143–44.

Thus, Plaintiff has proved the third and final element of its claim for avoidance of the Transfers. Accordingly, the Court finds that the Transfers were fraudulent and are avoidable under 11 U.S.C. § 548(a)(1)(B).

fers, and Biomar knew that the Transfers came from NCFE and not Lincoln Hospital or the Clinics. The "good faith" defense only protects transferees who "take for value and in good faith." To be entitled to the "good faith" protection, the transferee must give value to the debtor. *See* 11 U.S.C. § 548(c) ("[A] transferee or obligee of such a transfer or obligation *that takes for value and in good faith* has a lien on or may retain any interest

transferred or may enforce any obligation incurred, as the case may be, *to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."* (emphasis added)); *see also Klein v. Klein (In re Klein),* 1991 WL 242169, *16 (Bankr.N.D.Ill. June 21, 1991) (finding the good faith defense inapplicable because the defendants did not take in good faith and did not give value to the debtor for the transfer.).

Plaintiff is also entitled to recover the Transfers under 11 U.S.C. § 550(a)(1) from Biomar because it is undisputed that Biomar was the initial and only transferee of the Transfers. Accordingly, the Court will enter judgment for the Plaintiff and against Biomar in the amount of $608,000.00, plus costs and interest.

## C. Objection to Biomar's Claim

 Biomar asserts in its amended proof of claim that it is owed $315,000.00 for monthly maintenance fees provided to the Clinics and $180,000.00 for a software license and services provided to VillaView. *See* Vol. II at 133. Biomar argues that its claim should be allowed because it actually performed those services reflected in invoices sent to NCFE. This, however, does not establish a valid and enforceable obligation on NCFE to pay for those alleged services. *See* 11 U.S.C. § 502(b)(1).

NCFE did not agree to pay Biomar for the monthly maintenance fees for the Clinics, as Mr. Martia admitted under oath: "I believe the monthly maintenance fee was supposed to be paid by the clinics." Vol. II at 46; *see also* Plaintiff's Ex. 8; Vol. I at 87, 89, 209; Vol. II at 55, 77, 79. In fact, the testimony establishes that the software was not even installed and in operation at the Clinics at the time the monthly maintenance fees were supposedly incurred. *See* Vol. II at 10–11; Vol. III at 52.

Similarly, the testimony establishes that NCFE did not agree to pay Biomar for a software license and services for VillaView. *See* Vol. I at 87, 213–14; Vol. III at 62–63, 123–24. NCFE never made any payments to Biomar for work done to benefit VillaView. *See* Vol. I at 68; Vol. II at 6–7. Also, VillaView never agreed to the installation of the Biomar system. *See* Vol. III at 123. And, in fact, the Biomar system was never installed at VillaView. *See* Vol. II at 4; Vol. III at 123. Further, as detailed in Biomar's post-trial brief, Mr. Martia and Mr. Speer admitted that NCFE never actually agreed to pay for any of the services Biomar now claims to have performed without compensation. *See* Doc. 86 at 17.[11]

The Court simply has no evidence at all that NCFE incurred an obligation to pay Biomar the amounts sought in the amended proof of claim. For this reason the Court will sustain Plaintiff's objection to Biomar's claim.

Additionally, even had NCFE in fact incurred any obligation, such obligation would also be avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) because reasonably equivalent value was not given to NCFE in exchange for the obligation. NCFE received no reasonably equivalent value in return for the amount of Biomar's amended proof of claim. Only one Clinic went live (with no concrete quantifiable effect on NCFE) and the Biomar system was never installed at VillaView.

For these reasons, the Court disallows Biomar's proof of claim in its entirety.

---

11. The Court notes that Mr. Martia testified under oath that certain Biomar invoices had been paid, and also identified a contemporaneous document created by Biomar showing that certain Biomar invoices had been paid, yet Mr. Martia submitted a proof of claim, under penalty of perjury, stating that the invoices in question were unpaid and were due and owing, and in an answer to verified interrogatories identified the invoices attached to the proof of claim as detailing all the payments to which Biomar was asserting an entitlement. Mr. Martia's explanation that he overlooked his own documentation stating that the invoices were paid at the time he assembled his proof of claim was not credible in the Court's eyes. *See* Plaintiff's Ex. 5, 15, 16; Vol. II at 108–11, 120–22, 127–28, 131–32.

### V. Conclusion

For the foregoing reasons, the Court, in a separate entry, will (1) grant judgment in favor of Plaintiff and against Biomar for fraudulent transfers in the amount of $608,000.00; (2) sustain Plaintiff's objection to claim and disallow Biomar's amended proof of claim in its entirety; and (3) award Plaintiff its costs,

**IT IS SO ORDERED.**